2

INDEX TO REPORTER'S TRANSCRIPT

Reporter's Transcript Order                              1
Index                                                    2
Caption (March 17, 1999)                                 3
Introduction of Case to Jury                           4-6
Court's Opening Instructions to Jury                  6-14
Opening Statement by Mr. Smith                       14-20
Opening Statement by the Defendant                   20-21

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| **For the State:** | | | | |
| Annette Thomas | 22-38 | 38-47 | 47-49 | 49-50 |
| Patricia Goodwin | 51-58 | 58-60 | 60-61 | |
| Bill Landrum | 61-67 | 67-69 | | |
| Lon Russell | 70-83 | 83-87 | 87-88 | 88-90 |
| Colloquy Between Court & Counsel | | | | 91-93 |
| Dr. Medeiros | 93-100 | 100-102 | | |
| Motion | | | | 103-104 |
| **For the Deft.:** | | | | |
| Melvin Smith | 104-113 | 113-122 | 122-123 | 124 |
| Colloquy Between Court & Defendant | | | | 124-126 |
| **Rebuttal:** | | | | |
| Annette Thomas | 126-128 | 128-131 | 131-133 | 133 |

Motion                                             134-136
Objections to Closing Arguments                    137-138
Jury Charge                                         138-150
Verdict                                             151-155
Sentencing                                          156-159
Reporter's Certificate                                 160

STATE OF ALABAMA

IN THE CIRCUIT COURT FOR THE COUNTY OF RUSSELL

TWENTY-SIXTH JUDICIAL CIRCUIT

CRIMINAL

STATE OF ALABAMA

    v.                          Case No. CC 97-95

MELVIN SMITH,

       Defendant.
_____/

REPORTER'S OFFICIAL TRANSCRIPT

Before:

        Honorable George R. Greene and Jury
           Phenix City, Alabama - March 17, 1999

APPEARANCES:

        For the State:
          J. Maxwell Smith, Esq.
          Assistant District Attorney

        For the Defendant:
          W. Greg Graham, Esq.
          James P. Graham, III, Esq.
          Phenix City, Alabama

Linda S. Wilson
Official Court Reporter

4

```
 1        THE COURT:  Which case would the State call
 2             this morning?
 3        MR. SMITH:  May it please the Court, at this
 4             time the State would call the case of
 5             State of Alabama versus Melvin Smith,
 6             Case Number CC 97-95.
 7        THE COURT:  Is the State ready to proceed?
 8        MR. SMITH:  The State's ready, if it please
 9             the Court.
10        THE COURT:  Is Mr. Smith ready to proceed?
11        MR. GREG GRAHAM:  Yes, sir, Your Honor.
12        THE COURT:  Ladies and gentlemen of the
13             jury, would you please stand and raise
14             your right hands?
15             (Jury venire sworn.)
16        THE COURT:  The State has called for trial
17             the case styled as the State of Alabama
18             versus Melvin Smith, Case Number
19             CC 97-95.  Mr. Smith is charged under
20             an indictment which alleges that he did
21             engage in sexual intercourse with
22             Annette Thomas, a female, by forcible
23             compulsion, in violation of Section
24             13A-6-61 of the Code of Alabama,
25             against the peace and dignity of the
```

1       people of the State of Alabama, the

2       charge being rape in the first degree.

3              As we have on other days, we will

4       begin a series of general questions to

5       qualify the jury for the purpose of

6       selecting 12 jurors to serve in this

7       case, and as we said before, there are

8       no wrong answers.

9    MS. COULTER:  Are you Ms. Recktenwald?

10   PJ RECKTENWALD:  Yes.

11   THE COURT:  Ms. Recktenwald, I'll ask you to

12       stand and raise your right hand,

13       please.  Are you Mr. Phillips?

14   PJ PHILLIPS:  Yes, sir.

15   THE COURT:  All right.  If you'll stand and

16       raise your right hand, please, Mr.

17       Phillips.

18              (Potential jurors Recktenwald and

19                 Phillips were sworn by the Court.)

20   THE COURT:  As I indicated before, there are

21       no wrong answers because all the

22       answers will only come within what is

23       your personal knowledge, and it's very

24       important that you truthfully answer so

25       that a fair and impartial jury can be

1    selected for the State and on behalf of

2    Mr. Melvin Smith, who is present in the

3    courtroom today.  It would be wrong on

4    your part not to answer when you have a

5    duty to answer.

6        (Voir dire of jury venire.)

7        (Counsel and the circuit court

8         clerk struck the jury without the

9         presence of the court reporter.)

10       (Jury impaneled.)

11       (Rest of jury venire dismissed.)

12       (Jury sworn.)

13   THE COURT:  Ladies and gentlemen, before

14    proceeding with the trial of this case,

15    it will be helpful to you and to the

16    Court that you understand the rules and

17    procedure that will be followed by you

18    and by the Court in the case.  This is

19    a criminal case.  The procedure for the

20    trial of this case, as in all criminal

21    cases of this character, will be as

22    follows.  The case comes to you by way

23    of an indictment returned by a grand

24    jury in Russell County.  I read the

25    indictment to you while we -- right

1    before we qualified the jury.  The

2    indictment is not evidence in the case

3    and should not be considered by you as

4    evidence.  It is merely the written

5    means by which this case is brought

6    before you for trial.

7        The burden is upon the State to

8    prove the Defendant guilty as charged.

9    Before a conviction can be had in this

10   case, the State must satisfy each and

11   every member of the jury of the

12   Defendant's guilt beyond a reasonable

13   doubt.  Even if the State demonstrates

14   a probability of guilt, if it does not

15   establish it beyond a reasonable doubt,

16   you must acquit the Defendant.

17       Counsel for the State will make an

18   opening statement of the State's case.

19   Counsel for the Defendant or the

20   Defendant, Melvin Smith, will then make

21   his opening statement outlining his

22   defense.  Each side in the opening

23   statement will be confined to an

24   outline of the case and a statement of

25   what they expect the evidence to show.

1   This statement is intended to
2   familiarize you and the Court with the
3   case so that together we will be
4   familiar with the theories and
5   contentions of each side from the
6   beginning.
7       An attorney is an officer of the
8   Court and it is his duty to present
9   evidence on behalf of the clients, to
10  make such objection as he deems proper
11  and to fully argue his side's cause.
12  The attorneys' statements and arguments
13  are intended to help you understand the
14  evidence and apply the law.  However,
15  these statements are not evidence and
16  you should disregard any remark,
17  statement or argument which is not
18  supported by the evidence or by the law
19  as given to you by the Court.
20  Likewise, statements made by the Court
21  are not evidence and are not to be so
22  considered by you.
23      Following the opening statements,
24  witnesses will first be called by the
25  State to testify.  After the State has

presented witnesses, the Defendant will

then be permitted to call witnesses to

testify in his behalf.  All witnesses

will be sworn and will testify under

oath.  Their testimony will be

evidence.  There may be exhibits

offered which, if received by the

Court, will also be evidence.  It will

be upon all of this evidence that you

will arrive at your final verdict.

When a judge and a jury sit

together as a court of law, it is the

duty of the judge to see that the trial

progresses in an orderly fashion, to

rule upon all legal matters that are

presented, to define the issues

involved and instruct the jury as to

the law applicable to the particular

case.  It will be your duty as jurors

to follow the law as so stated to you

by the Judge.  You will, therefore,

render a verdict in accordance with the

facts as you determine them from the

evidence and the law as given to you by

the Court.

10

1            As the jury, you will be the sole

2    and exclusive judges of the facts.  It

3    will be your duty to attempt to

4    reconcile the testimony of all the

5    witnesses so as to make them all speak

6    the truth, if this can be done

7    reasonably.  If you cannot reasonably

8    reconcile all the testimony, it is then

9    your duty to consider the testimony

10    with a view of determining what the

11    true facts are.  In so doing, you may

12    accept or reject any part of the

13    testimony of any witness and accept

14    only the testimony you consider worthy

15    of belief.

16            During the trial, I will rule on

17    objections by counsel as to the

18    admissibility of testimony and other

19    evidence.  It is the privilege and duty

20    of counsel to make such objections to

21    the offer of evidence which they

22    consider illegal and improper.  You

23    should not concern yourself with the

24    reasons for my rulings since my rulings

25    are controlled and required by law.

1    You are not to speculate as to possible

2    answers to questions which I do not

3    require to be answered.  The overruling

4    of objections to evidence is not

5    intended to indicate the weight to be

6    given such evidence by you.  Such

7    admitted evidence will be considered

8    along with all the other evidence.  You

9    are to disregard all evidence which may

10   be excluded by the Court.

11        Following the close of evidence in

12   the case, the attorneys will have the

13   privilege of again addressing you.

14   This is sometimes referred to as

15   summation or the argument of counsel.

16   The attorneys have the right to discuss

17   the evidence and all the reasonable

18   inferences to be drawn therefrom to

19   help you arrive at a just and true

20   verdict.  The attorney for the State

21   will have the right to open the

22   arguments, counsel for the Defendant or

23   Mr. Smith has the right to follow the

24   opening argument, and then counsel for

25   the State will have the right to a

1   closing argument.  Following the

2   arguments of counsel or the attorneys,

3   it will be your duty -- it will be the

4   Court's duty to state to you the

5   applicable rules to guide you in

6   arriving at your verdict.  The case

7   will then be submitted to you for your

8   deliberation and verdict.  Upon

9   retiring to the jury room, you elect

10  one of your number as foreman to

11  moderate your discussion and to sign

12  and return the verdict arrived at by

13  you to the Court.

14      No juror should attempt to make an

15  individual investigation of the facts

16  or of anyplace testified about.  It

17  therefore follows that you are not

18  authorized to gather evidence on your

19  own account or on behalf of any of the

20  parties to the case.  You should not

21  attempt to visit any scene of the

22  alleged crime or inspect any item or

23  object of property unless that object

24  or property has been received in

25  evidence and the inspection is made in

1   the courtroom or in the jury room.

2       During the trial, you have the

3   legal right to take notes, but the

4   Court does not generally recommend

5   taking notes unless it deals with

6   figures and mathematical calculations

7   which could be useful for you to keep

8   up with.  If notes are to be taken by

9   you, they are to be used simply as an

10   aid for your memory and assistance, and

11   they are not an authoritative record to

12   show to the other jurors.

13       Until the case is submitted to you

14   for your deliberation, you must not

15   discuss the case with anyone nor permit

16   anyone to discuss the case with you or

17   in your hearing.  You are to keep an

18   open mind and you shall neither discuss

19   nor decide any issue in this case among

20   yourselves until the case is submitted

21   to you for your deliberations under the

22   instructions of the Court.  If members

23   of your family or friends or anyone

24   else should ask you about the case, you

25   should tell them that you are under the

1      Court's instruction not to discuss it.

2      When the trial is over and your verdict

3      rendered, you will then be released

4      from this instruction and you will then

5      be free to discuss the case and your

6      experiences as a juror, if you so

7      desire.

8           The attorneys, parties and

9      witnesses are not permitted to talk to

10     you during the trial.  Even a

11     discussion which has no relation to the

12     case might give a bad appearance.  If

13     the participants in the trial fail to

14     greet you or converse with you during

15     this trial, it will be due to this

16     rule.

17          That concludes the Court's opening

18     statement.  We will now begin with the

19     attorneys or Mr. Smith's, the

20     Defendant's, opening statement.  Mr.

21     Max Smith, the Assistant District

22     Attorney, will begin on behalf of the

23     State.

24  MR. SMITH:  Thank you, Your Honor.  May it

25          please the Court, Mr. Graham, Mr.

 1    Graham, ladies and gentlemen of the
 2    jury, once again good morning.  Before
 3    I get started with the opening
 4    statement, I want to introduce to you
 5    Mr. Joe Edwards, who will be sitting
 6    with me at counsel table.  Mr. Edwards
 7    is an Assistant D.A. in our office as
 8    well as our chief investigator.  He
 9    will be assisting me in this trial.
10        October 25th, 1996 is a day that
11    is etched in the memory of Ms. Annette
12    Thomas, and it will be forever more.
13    On that day, at approximately seven
14    p.m. -- excuse me, seven a.m. in the
15    morning to around 7:30 in the morning,
16    a man by the name of Melvin Smith, the
17    Defendant in this case, a man she had
18    known for her whole life, a man she had
19    went to school with, and who for the
20    past several months she had been giving
21    a ride to work in the morning.
22        Ms. Thomas lives in Hurtsboro or
23    lived in Hurtsboro at the time in
24    October when this occurred.  She, I
25    believe, worked at Tuskegee University

1    and Mr. Smith, the Defendant, worked at

2    the V. A. Hospital, so she, knowing

3    him, would give him a ride to work in

4    the morning.  He would pay her gas

5    money on occasion.

6         A couple of days before the 25th

7    of October, Ms. Thomas had been in

8    Atlanta on some business or some

9    personal matters.  When she returned

10    that Friday -- actually, I think she

11    returned on Thursday, Friday was the

12    25th -- when she returned and woke up

13    that morning on the 25th of October, at

14    around seven a.m. to 7:30 a.m., Mr.

15    Smith was at her door.  Of course, she

16    knew him.  She wasn't supposed to take

17    him to work that day, but he was there

18    to pay her some money for gas for prior

19    trips to Tuskegee or for future trips

20    to Tuskegee.

21         He came inside and removed his

22    wallet from his pocket, and he shut the

23    door behind him.  At this point Ms.

24    Thomas is alarmed.  She feels

25    threatened.  Mr. Smith follows her,

1    pushes her into her bedroom and shuts

2    the door, and pulls out a knife and

3    says look what I've got and proceeds to

4    rape her. She screamed. She resisted

5    him. He hit her in the face. He

6    scratched her. She scratched him

7    trying to resist him. And when he was

8    done doing what he did to her, he left,

9    and she went and locked the door and

10    called her sister and brother and told

11    them what happened.

12    Shortly thereafter, Chief Jay King

13    with the Hurtsboro Police Department

14    arrived at her home to check on Ms.

15    Thomas. Her sister, Patricia Goodman,

16    who you saw here this morning, will

17    testify. The two of them then went to

18    Phenix Regional Hospital by way of an

19    ambulance from Hurtsboro. When they

20    arrived at the hospital, Ms. Thomas,

21    obviously distraught and traumatized by

22    all this, was examined by a doctor, was

23    given a sexual examination for the

24    possible collection of evidence and

25    whatnot. His name is Dr. Medeiros,

1    Steven Medeiros, who is an attending

2    emergency room physician.  He's from

3    Roanoke, but he works here and

4    contracts here in Phenix City at the

5    hospital.  He will testify to the

6    extent of Ms. Thomas injuries.  She had

7    bruises on her face.  She had a cut

8    lip.  She had a swollen mouth.  She had

9    broken fingernails and she was

10   traumatized.

11        Later that day, Mr. Smith was

12   arrested and was placed in the jail.

13   Some days after that, he called Ms.

14   Thomas, we'd expect the evidence to

15   show.  He called her from jail and

16   apologized to her for what he had

17   done.  Also, sometime after this

18   offense, Mr. Smith wrote Ms. Thomas two

19   letters to be delivered by his wife to

20   Ms. Thomas, and they were.  One of the

21   letters again was an apology.

22   Actually, the first letter, I believe,

23   was an apology for what he had done.

24   And Mr. Smith's wife took that letter

25   back from Ms. Thomas, but Ms. Thomas

1    was able to keep the other letter, and

2    you'll be able to see that letter and

3    judge for yourself what actually it

4    is.

5         Sometime later, the Defendant, Mr.

6    Smith, was interviewed by Sergeant Lon

7    Russell, the police officer you saw

8    here earlier this morning, and Mr.

9    Smith agreed to give Sergeant Russell a

10   statement regarding the alleged

11   incident here.  And what he told

12   Sergeant Russell is that, yeah, I had

13   sex with Annette Thomas on the morning

14   of October 25th, 1996, but it was her

15   idea.  In fact, I had been having an

16   affair with Ms. Thomas for about four

17   years, one to four years, and that,

18   yeah, I hit her when we were having

19   sex, but she made me do it.  That was

20   his statement among other things to

21   Sergeant Russell, and you'll be able to

22   hear that statement and read that

23   statement.

24        Ladies and gentlemen, this is

25   factually a very simple case.  It's an

1     important case both to the Defendant

2     and to Ms. Thomas.  As I said, this is

3     a day that is etched in her memory and

4     will be forever more.  I'm confident

5     that once you hear the testimony from

6     the State's witnesses, the only verdict

7     you can come back with in this case is

8     that the Defendant, Melvin Smith, is

9     guilty of rape in the first degree.

10    Thank you.

11    THE COURT:  Who would make the opening

12    statement on behalf of the Defendant,

13    Melvin Smith?

14    THE DEFENDANT:  If it please the Court,

15    ladies and gentlemen of the jury --

16    THE COURT:  All right, Mr. Smith, before you

17    would start, I know that you're

18    participating on your own behalf.  This

19    is an opening statement of what you

20    expect the evidence to show.  It is not

21    an opportunity for you to testify in

22    front of the jury, and confine your

23    remarks to what you expect the evidence

24    to show, okay?  You may begin.

25    THE DEFENDANT:  Thank you, sir.  What I

1    expect the evidence to show is that I

2    didn't rape her.  I mean, it's simple.

3    There's a lot of lies,

4    inconsistencies.  The D.A. has the

5    burden of proof here.  They have to

6    prove without a reasonable doubt that

7    it happened as they said it happened.

8    It did not.  It's simple.  A lot of

9    things have been said, a lot of people

10    have said things.  I've kept my mouth

11    shut to this moment.  I've waited for

12    my moment to vindicate myself, my wife

13    and my children.

14    THE COURT:  You need to confine your remarks

15    to what you expect the evidence to

16    show.  I told you that previously, and

17    I'm not going to keep warning you about

18    that.  This is not an opportunity for

19    you to argue the case to the jury.

20    THE DEFENDANT:  Thank you, sir.  You know,

21    all I want the jury to do is watch,

22    make sure we have a fair trial.  That's

23    what I'm asking of you.  Thank you.

24    THE COURT:  All right.

25    (Brief pause.)

1      THE COURT:  Who would the State call as its

2           first witness?

3      MR. SMITH:  May it please the Court, the

4           State would call Annette Thomas to the

5           stand.

6                ANNETTE THOMAS

7      was sworn and testified as follows:

8                DIRECT EXAMINATION

9  BY MR. SMITH:

10  Q    Would you please state your name for the record?

11  A    Annette Thomas.

12  Q    Ms. Thomas, if you could, talk as loudly as you

13       can so that these jurors in the back here can

14       hear you, okay?

15  A    (Witness nods head affirmatively.)

16  Q    Your name again is Annette Thomas?

17  A    Right.

18  Q    Ms. Thomas, how old are you?

19  A    I'm 31.

20  Q    And where are you currently living?

21  A    Currently, I live in Tuskegee.

22       THE COURT:  You'll need to speak up so the

23            jurors can hear you and that I can hear

24            you and that the defense counsel and

25            Melvin Smith can hear you, okay, Ms.

23

1              Thomas?

2              THE WITNESS:    Okay.

3    Q    Currently, you said you live in Tuskegee?

4    A    Right.

5    Q    Where do you work?

6    A    I work for -- I work in Tuskegee at Southeast

7         Alabama Self-Help Association.

8    Q    What do you do for them at that place of

9         employment?

10   A    I'm an economic development coordinator.

11   Q    Previous to you living in Tuskegee, where did you

12        live?

13   A    In Hurtsboro, 15 Stovall Drive.

14   Q    15 Stovall Drive?

15   A    Right.

16   Q    And did you live with anyone there at 15 Stovall

17        Drive?

18   A    My sister and my father, but at the time he

19        wasn't living there because he just came out of

20        the hospital and he started living with my sister

21        Patricia.

22   Q    Ms. Thomas, do you know the Defendant in this

23        case, Melvin Smith?

24   A    Yes.

25   Q    How do you know him?

```
 1   A    We from the same area.  We went -- he's a couple
 2        of years older than I am.  We went to the same
 3        elementary school and high school, and he would
 4        ride to work with me and my sister, but after my
 5        sister moved, he started riding with me.
 6   Q    Where would you take him to work?
 7   A    To the V.A.
 8   Q    In Tuskegee?
 9   A    Right.
10   Q    Were you working at the V.A. at that time?
11   A    No.  I was working for the university.
12   Q    Do you know how long it was that you were taking
13        him back from Hurtsboro to Tuskegee, how long did
14        that go on, if you know?
15   A    I don't know.
16   Q    That would have been prior to October of '96?
17   A    Right.
18   Q    Now, did Mr. Smith, did he give you any kind of
19        payment for taking him to and from --
20   A    Yes.
21   Q    -- Tuskegee?  What would he pay you?
22   A    We never set a fee.  Sometimes he'd give me
23        $10.00, but I never set a fee.
24   Q    And was it always you driving?
25   A    Yes.
```

```
 1    Q    Did he ever drive?

 2    A    No.

 3    Q    Now, Ms. Thomas, I'm going to take you back to

 4         October the 25th, which I believe would have been

 5         a Friday; is that correct?

 6    A    Right.

 7    Q    Tell the ladies and gentlemen of the jury where

 8         you were, say, a day or two before that.

 9    A    I was in Atlanta.  I left Wednesday morning with

10         my boss, we went to Atlanta for my job.  We

11         returned on Thursday evening.

12    Q    Were you going to work on Friday?

13    A    Right.

14    Q    Were you to take Mr. Smith to work on Friday?

15    A    No.

16    Q    Why was that?

17    A    He didn't ask me.

18    Q    On Friday morning, October the 25th, 1996, can

19         you tell the ladies and gentlemen what you

20         remember happening at your home on Stovall Drive?

21    A    It was about between seven and 7:30 a.m.

22    Q    Is that Central Time?

23    A    Central Time, right.

24    Q    Okay.

25    A    I was getting ready, getting dressed for work,
```

```
 1        and Melvin knocked at the door and before I asked
 2        -- before I opened the door, I asked who it was
 3        and what he wanted, and he said it was Melvin and
 4        he wanted to pay me for taking him to work
 5        because he didn't finish paying me.  So I opened
 6        the door, I left the door open.  He opened the
 7        screen door and he took his wallet out like he
 8        was going to pay me.  Then he started backing in
 9        and he closed the door behind him.  And then my
10        bedroom then was -- this is the hallway and my
11        bedroom is right next to the hallway.  So he
12        started backing in, I started backing back, and
13        he pushed me into my bedroom, and then I fought
14        as hard as I could with him and I screamed.  He
15        told me to shut up.
16   Q    Ms. Thomas, let me interrupt you for just a
17        second.  Was anyone else at home with you when
18        this happened?
19   A    No.  Melvin knew, he knew my father had been in
20        the hospital since July to October.  He knew my
21        sister was at work.  So he knew, he knew the
22        schedule.  So after he came in, he pushed me on
23        the bed and I fought him, and he told me to shut
24        up and then he took out a knife and told me to
25        look, look what I got, and then I couldn't do
```

1   anything else.  And we fought and we fought until

2   he put me in a position where I could not move,

3   which is like a corner which was the bed, then

4   the wall against the bed, and I couldn't go

5   anywhere.

6   Q   And you said that he had a knife?

7   A   Yes.

8   Q   Do you know what kind of knife it was?

9   A   I think it was like a pocketknife.

10  Q   And he showed that to you?

11  A   Yes.

12  Q   Did he say anything to you?

13  A   He just told me to shut up and look what I have.

14  Q   And then what happened?

15  A   And like I said, we fought.  And he pushed me on

16      the floor, I was on the floor, and then he took

17      the bottom part of my clothing off and then he

18      had oral sex with me and then he raped me.

19  Q   Ms. Thomas, do you recall what you were wearing

20      that morning?

21  A   I had everything on except my outer clothes for

22      work.  I had on my housecoat.

23  Q   You had on a housecoat?

24  A   (Witness nods head affirmatively.)

25  Q   Ms. Thomas, I'm going to show you what I am now

1   marking as State's Exhibit 3 and ask you, if you

2   could, to identify the contents of this bag.  You

3   know what that is?

4 A That's my robe.

5 Q Is this what you were wearing on the morning of

6   October the 25th?

7 A Yes.

8 Q Did you have on any undergarments?

9 A (Witness nods head affirmatively.)

10 Q Do you remember what kind of undergarments you

11   had on?

12 A I had on my bra and my underwear and stockings.

13 Q You had on stockings, your bra and underwear.

14   Let me show you what I'm going to mark as State's

15   Exhibit Number 4 and ask you, if you could, to

16   look inside this bag and tell me what that is.

17 A A bra.

18 Q Is that the bra you had on that morning?

19 A Yes.

20 Q Now, Ms. Thomas, when -- you said that you

21   resisted Mr. Smith from this assault; is that

22   correct?

23 A Yes.

24 Q What did you do to resist him?

25 A I hit him.

```
 1   Q    Okay.  Did you scratch him?

 2   A    I probably did.  I don't know.  I can't remember.

 3   Q    Did he hit you in any kind of way?

 4   A    Yes.

 5   Q    Where did he hit you?

 6   A    He gave me a black eye.  He hit me in my face.

 7   Q    Did you have any kind of markings on you --

 8   A    Yeah.

 9   Q    -- as a result of this assault?

10   A    I still have the cut on my left arm -- my left

11        hand.

12   Q    On your left arm?

13   A    My left hand.

14   Q    Could you hold that up for the ladies and

15        gentlemen of the jury?

16   A    It's right there.

17   Q    Did you have to get any kind of stitches or

18        anything for that?

19   A    No stitches.

20   Q    Now, Ms. Thomas, I'm going to ask you this

21        question, I don't mean to embarrass, I know it's

22        a sensitive matter, but I'm going to ask you this

23        question anyway.  When you said that he raped

24        you, when Mr. Smith raped you, do you mean that

25        he had sexual intercourse with you?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And you mean sexual intercourse, do you mean that |
| 3 | | he placed his penis in your vagina? |
| 4 | A | Yes. |
| 5 | Q | Do you know about how long this lasted? |
| 6 | A | Probably about three to five minutes, I guess. |
| 7 | Q | What happened after he quit assaulting you? |
| 8 | A | He laid my head on some pillows. He checked my |
| 9 | | pulse. Then he left. |
| 10 | Q | He checked your pulse? |
| 11 | A | (Witness nods head affirmatively.) |
| 12 | Q | And then he left? |
| 13 | A | (Witness nods head affirmatively.) |
| 14 | Q | What did you do at that time? |
| 15 | A | I got up and I locked the door and he came back, |
| 16 | | but he couldn't get in because I had locked the |
| 17 | | door. |
| 18 | Q | He came back to the house? |
| 19 | A | Right. |
| 20 | Q | Did he say anything when he came back to the |
| 21 | | house? |
| 22 | A | No. I think -- well, he had left his wallet. |
| 23 | Q | He had left his wallet? |
| 24 | A | Right. |
| 25 | Q | And how long did he stay when he came back? |

1   A   He just tried to get in, but the door was locked

2       and he left.

3   Q   What time do you think it was when he left?

4   A   I don't know.

5   Q   What did you do after he finally left?

6   A   I called my sisters and my brother.

7   Q   And did you tell them what had happened?

8   A   Right, I did.

9   Q   And what happened then?

10  A   After I called my sister in Tuskegee and my

11      sister in Montgomery, then I called my brother in

12      North Carolina, and then I called my sister

13      Patricia at Oliver.  She was at work, so I called

14      her up.

15  Q   Your sister Patricia?

16  A   Right.

17  Q   Does all your family know Mr. Smith?

18  A   Right.

19  Q   So they knew who you were talking about?

20  A   Right.

21  Q   What happened after you called them?

22  A   I know my aunt came over.  My sister Sandra came,

23      she's another teacher.  And a lady named Daisy

24      Tolbert was there.  And then Pat came and then

25      the ambulance came.

32

| | | |
|---|---|---|
| 1 | Q | Did the police ever arrive? |
| 2 | A | Yes. |
| 3 | Q | Who arrived from the police department? |
| 4 | A | Chief King. |
| 5 | Q | And an ambulance you said arrived? |
| 6 | A | Right. |
| 7 | Q | Were you taken to the hospital? |
| 8 | A | Right. |
| 9 | Q | Which hospital were you taken to? |
| 10 | A | It was here in Phenix City. |
| 11 | Q | Phenix Regional? |
| 12 | A | Right. |
| 13 | Q | Did anyone go with you to the hospital? |
| 14 | A | My sister Patricia. |
| 15 | Q | Patricia? |
| 16 | A | (Witness nods head affirmatively.) |
| 17 | Q | Okay.  What happened when you got to the |
| 18 | | hospital? |
| 19 | A | They did a test on me.  There was a nurse there |
| 20 | | and the doctor was there. |
| 21 | Q | Do you remember what kind of a test they did on |
| 22 | | you? |
| 23 | A | I don't know the name of the test. |
| 24 | Q | Well, did they give you an examination of your |
| 25 | | body? |

```
 1   A    Yes.

 2   Q    And a Dr. Medeiros; is that correct?

 3   A    Right.

 4   Q    Now, your home at where this occurred, you said,

 5        is at 15 Stovall Drive; is that correct?

 6   A    Right.

 7   Q    Where is that?  Is that in Hurtsboro?

 8   A    Yes, it is.

 9   Q    And is that in Russell County?

10   A    Right.

11   Q    Let me ask you this, Ms. Thomas, have you ever

12        had a consensual sexual relationship with the

13        Defendant in this case, Mr. Smith?

14   A    Never.

15   Q    Never.  Has he ever indicated to you that he

16        wanted to be more than just friends?

17   A    He would call sometimes and say that he's been in

18        love with me since high school.

19   Q    And what would your response to that be?

20   A    We have nothing to talk about.

21   Q    After Mr. Smith was arrested, did you have any

22        contact with him?

23   A    Yes.

24   Q    How did that come about?

25   A    Well, the first time, I think, either before the
```

| 1 | | preliminary hearing or after, his wife called and |
|---|---|---|
| 2 | | he was on the other end, so it was like a |
| 3 | | three-way call. |
| 4 | Q | Did you know where he was? |
| 5 | A | Yes. |
| 6 | Q | Where was he? |
| 7 | A | He was in jail. |
| 8 | Q | And he called you through his wife? |
| 9 | A | Right. |
| 10 | Q | So all three of you all were on the phone? |
| 11 | A | Right. |
| 12 | Q | What did he say? |
| 13 | A | Actually, he really didn't say a whole lot |
| 14 | | because we wasn't on long and just the same |
| 15 | | thing, he was sorry. |
| 16 | Q | He told you that he was sorry? |
| 17 | A | He was sorry. |
| 18 | Q | Other than the telephone call, has he had any |
| 19 | | communication with you? |
| 20 | A | Not verbally.  He wrote two letters. |
| 21 | Q | Okay.  I'm going to show you what I'm marking as |
| 22 | | State's Exhibit Number 5 and ask you, if you |
| 23 | | could, to identify that. |
| 24 | A | This is the letter that I got from his wife. |
| 25 | Q | You got that from his wife? |

1    A    Right.

2    Q    Do you know his wife's name?

3    A    Yes.

4    Q    What's her name?

5    A    Louise Smith.

6    Q    And did you get that letter before or after he

7         talked to you on the phone?

8    A    After.

9    Q    When you got the letter, do you know where he

10        was?

11   A    Yes.  He was still in jail.

12             MR. SMITH:  Your Honor, may I use the

13                  easel?

14             THE COURT:  Yes.

15             MR. SMITH:  Thank you.

16                  (Brief pause.)

17   Q    Ms. Thomas, if you would, I'd like for you to

18        read that note that was sent to you by the

19        Defendant, if you would, and for the record, I'm

20        showing the jury State's Exhibit Number 6, which

21        is just an enlargement of State's Exhibit Number

22        5.

23   A    Okay.  Like I said, there were two letters.  This

24        is the one he wrote to my family.

25   Q    Okay.

1   A    And it starts off, Thomas Family.  Questions to

2          Answer:  Is the prison system of God or the

3          devil?  Which is greater, love or hate?  If I

4          forgive people, will I be forgiven?  If I don't

5          forgive people, will I be forgiven?  Is man laws

6          greater than God's?  If it were the other way

7          around, what would Jesus do?  What is the golden

8          rule?  Does one event defines a person's life?

9          If Melvin was my husband, would I divorce?  Do we

10        have to live by the Word of God?  Does Louise,

11        Demetrius, Dominique and Davina have to suffer

12        from Melvin's sins or mistakes?  Can another

13        person judge us?  If God told you to do something

14        and man told you to do something different, which

15        would you obey?  Is God a healer?  Is God a

16        redeemer?  Is God a salvationor?  Is God able to

17        do all things?  What makes God who he is?  What

18        makes a person great in God's eye?  What are the

19        fruit of the spirit?

20   Q   And that's the end of the letter?

21   A   Right.

22   Q   Ms. Thomas, does that letter in its appearance

23        today fairly and accurately portray the same

24        letter that you received from Mr. Smith's wife?

25   A   Right.

1    Q    Has it been changed or altered in any way?

2    A    No, it hasn't.

3              MR. SMITH:  We'd ask that it be admitted,

4                   Your Honor.

5              THE COURT:  Be admitted and received, as

6                   State's Exhibit Number 5?

7              MR. SMITH:  Yes, sir.

8                   (State's Exhibit 5 was admitted in

9                   evidence.)

10   Q    When you read that letter, what did it mean to

11        you?

12   A    Nothing.  It's just trying -- I think at that

13        time he knew what he had done and he knew that I

14        only been nice to him and he knew he was wrong

15        and that's why he wrote it.

16   Q    Ms. Thomas, I want you to look around this

17        courtroom, if you could, and point out the man

18        who assaulted you on October the 25th, 1996?

19   A    Melvin Smith.

20   Q    Could you describe what he's wearing?

21   A    A blue pinstripe suit.

22   Q    And it's your testimony that you did not consent

23        to having sexual intercourse with Mr. Smith; is

24        that right?

25   A    No, I did not.

1          MR. SMITH:  Mr. Graham, the witness is with

2              you.

3                  CROSS EXAMINATION

4   BY MR. GREG GRAHAM:

5   Q    Ms. Thomas, I'm going to you some questions and

6        some of them may be repetitive of what Mr. Smith

7        asked you.  I'll try to keep them at a minimum,

8        but I may not have just heard your answer or

9        quite understood it.  You stated that you went to

10       elementary school and just kind of grew up in the

11       same neighborhood as Melvin?

12  A    Right.

13  Q    And that you all rode to work together?

14  A    Right.

15  Q    And you all rode to Tuskegee?

16  A    Right.

17  Q    And you worked at the Tuskegee University and

18       Melvin worked at the V. A. Hospital?

19  A    Right.

20  Q    And he would pay you for driving?  No set amount?

21  A    Right.

22  Q    Just kind of here and there?  How would you

23       describe your relationship with Melvin?

24  A    Melvin and I have no relationship at all.  We

25       never had a relationship.

1    Q    As far as would you describe it as an

2         acquaintance, friends?

3    A    Friends, no.   Acquaintance.

4    Q    And how long did you all ride back and forth to

5         work?

6    A    Well, like I said, it started out with my sister

7         and after she moved, he started riding with me.

8    Q    Okay.

9    A    More than a year.

10   Q    A couple of months, a year?

11   A    Probably more than a year.

12   Q    A year-and-a-half?

13   A    Maybe.   I'm not sure.

14   Q    But you all are just acquaintances?

15   A    Right.

16   Q    At any time during this year-and-a-half -- was

17        the year-and-a-half when you all rode together

18        just you and Melvin or is that you, Melvin and

19        your sister?

20   A    He didn't ride with me every day.

21   Q    So on average, how many days a week would it be?

22   A    Sometimes he would ride a whole week.   On an

23        average, probably three times a week.   I'm not

24        sure.

25   Q    And this would just be Monday through Friday?

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | During the times that you all rode together, did |
| 3 | | Melvin ever give you any gifts or send you |
| 4 | | flowers to work or anything like that? |
| 5 | A | No. |
| 6 | Q | Did you ever send Melvin anything like that? |
| 7 | A | No. |
| 8 | Q | Did you all ever -- on the way home from work or |
| 9 | | to work, did you all ever stop anywhere and get a |
| 10 | | drink? |
| 11 | A | Never, never. |
| 12 | Q | Or breakfast or McDonald's? |
| 13 | A | No.  If I stopped anywhere, I would stop at my |
| 14 | | sister's house to run in and get something and he |
| 15 | | would sit in the car. |
| 16 | Q | Is that your sister that lives in Hurtsboro? |
| 17 | A | Right. |
| 18 | Q | And what sister was that? |
| 19 | A | That's Gail. |
| 20 | Q | And she's not -- is the she the one that lived |
| 21 | | with you? |
| 22 | A | No. |
| 23 | Q | And you stated earlier that you had never been |
| 24 | | intimate with Melvin before? |
| 25 | A | No, never. |

1    Q    And were you all having an affair?

2    A    Never.

3    Q    Did you ever go to Ms. Smith and state to her

4         that you were having an affair with Melvin?

5    A    Never.

6    Q    Did you invite Melvin over that morning?

7    A    No, I didn't, because I hadn't even been in

8         contact with Melvin.

9    Q    When was the last time you had spoken to Melvin?

10   A    I don't know.  I don't know.

11   Q    A week, a month?

12   A    I don't know.

13   Q    When Melvin, you said, came in the house with his

14        wallet and that's -- you backed -- he backed

15        up -- he came in, shut the door and you backed

16        up?

17   A    (Witness nods head affirmatively.)

18   Q    And you stated that he had his wallet in one hand

19        and then he pulled -- then he pushed you into

20        your bedroom?

21   A    Right.

22   Q    Do you know what happened to the wallet?

23   A    Chief King got the wallet.  I don't know what

24        they did with it.

25   Q    Do you know where it was in your house?

1   A   It was on -- no, I can't say.  I don't know.  I

2       don't know whether it was on the bed or on the

3       floor.

4   Q   But it wasn't on a -- was it on a dresser?

5   A   I don't know.  I can't remember.

6   Q   So it could be possible that it was, you just

7       don't remember?

8   A   I don't remember.

9   Q   So when he pushed you in the room and he pushed

10      you on the bed, correct?

11  A   Right.

12  Q   And is that when the knife --

13  A   He pushed me on the bed and I screamed, and

14      that's when he said -- told me to shut up and

15      look what I got.

16  Q   And that's when he --

17  A   He pulled the knife out.

18  Q   And you said it was like a pocketknife?

19  A   Right.

20  Q   Do you remember what hand he had it in?

21  A   No, I don't.

22  Q   You stated that was between seven and 7:30

23      Central Time?

24  A   Right.

25  Q   Was that -- when you and Melvin rode together,

1      did he come to your house or did you pick him up

2      on the way?

3   A   Most of the time he would come to the house.

4   Q   So it wasn't uncommon for him to come over that

5      early?

6   A   No.

7   Q   You stated that you were wearing stockings at the

8      time?

9   A   Right.

10  Q   And the materials you were wearing, stockings, a

11     bra, and I guess that's a nightgown?

12  A   A robe.

13  Q   It's a robe.  Does the robe button or does it

14     tie?

15  A   It buttons.

16  Q   It buttons, okay.  And how far is it from your

17     bedroom then from the front door to your

18     bedroom?  Would you say it was from me to you or

19     from you to the door?

20  A   Probably from --

21  Q   Or from me to Ms. Wilson?

22  A   About this distance.  This is the hallway and

23     that's my bedroom.  This is the front door.

24  Q   So like a foot or two?

25  A   Probably.

44

1   Q   Do you remember which eye it was?

2   A   Left.

3   Q   Your left eye, okay.  And how long did this --

4       from the time Melvin walked in the door until he

5       left, do you remember how long it was?

6   A   No, I don't.

7   Q   And you don't know where the wallet was, you just

8       know that Chief King recovered it?

9   A   State that again, I didn't hear you.

10   Q   You don't know where the wallet was in your home,

11       you just know Chief King recovered it?

12   A   Right.

13   Q   And there was no one else home?

14   A   No.

15   Q   Was the undergarments, was your bra torn that you

16       can remember?

17   A   I don't think so.

18   Q   And was your nightgown torn?

19   A   No.

20   Q   Were any buttons torn off of it?

21   A   I don't know, I haven't checked.

22   Q   But you don't remember?

23   A   No.

24   Q   Do you remember if the gown was buttoned or

25       unbuttoned or just --

1   A    Are you saying before Melvin came?

2   Q    Before Melvin came, yeah.

3   A    Oh, definitely, it was buttoned.

4   Q    But during the course of the incident, you're

5        stating that it was unbuttoned?

6   A    I'm not saying that.  I said I don't remember.

7   Q    You don't remember if it was unbuttoned?

8   A    If it was unbuttoned, it's because he did it.

9   Q    So he would have unbuttoned it, okay.  Did you

10       keep the stockings that you had on that day?

11  A    Did I keep them?

12  Q    Right.  Or did you throw them away right after it

13       happened?

14  A    I don't know.

15  Q    You don't know what happened to them?

16  A    I don't know what happened to them.

17  Q    Do you know if they were torn or --

18  A    I don't know.

19  Q    Now the letter that Mr. Smith showed you earlier,

20       is that letter signed by Melvin?

21  A    No, it's not.

22  Q    Did he personally deliver that to you?

23  A    No, he did not.

24  Q    Isn't it true that you went to his wife and took

25       the letter from her?

1  A    Yes, I did, because she called me to come and

2       pick it up.

3  Q    So you went to Melvin's house --

4  A    Right.

5  Q    -- to get the letter from his wife?

6  A    Right.

7  Q    Have you been by Melvin's house after the

8       incident other than to pick up that letter?

9  A    There was an incident that she -- I talked to his

10      wife.

11 Q    What's her name again?

12 A    Louise.  I talked to his wife and she was

13      saying -- let me -- I've known his wife my whole

14      life and she's a real nice person, and I talked

15      with her and she was telling me some things that

16      had happened between them and she was talking

17      about her children, and so my sister have

18      children about the same size as her children, so

19      my sister gave her some of her children's

20      clothes.

21 Q    And that's the only other time you've been by

22      there?

23 A    That's the only other time.

24 Q    To pick up the letter and about the children's

25      clothes?

```
 1   A     Right.

 2                 MR. GREG GRAHAM:  We have no more questions,

 3                 Your Honor.  Thank you, Ms. Thomas.

 4             THE COURT:  Do you have any additional

 5                 questions of this witness?

 6             MR. SMITH:  Yes, sir, thank you.

 7                      REDIRECT EXAMINATION

 8   BY MR. SMITH:

 9   Q     Ms. Thomas, who took your clothes off?

10   A     He did, Melvin did.

11   Q     Did he rip them off of you?

12   A     He didn't take off my bra and he didn't -- my

13         upper part he didn't mess with, just the lower

14         part he did.

15   Q     Now, Mr. Graham asked you it wasn't uncommon for

16         Melvin Smith to come by your house for you all --

17   A     Right.

18   Q     -- to go on your ride together?

19   A     Right.

20   Q     Was it uncommon for him to come in your house?

21   A     The only other time that I can remember Melvin

22         coming to my house was that if he would go

23         fishing, he would take my father -- bring my

24         father some fish.

25   Q     But he had never been in the house with you
```

1        alone?

2   A    No, never.

3   Q    Mr. Graham also asked you and you can't testify

4        or that Mr. Smith didn't personally deliver that

5        note to you; is that correct?

6   A    Right.

7   Q    Is it possible for him to have personally

8        delivered it to you?

9   A    No.

10  Q    Why is that?

11  A    He was in jail.

12  Q    On the note itself, there's mention -- if you

13       would, look at State's Exhibit 5.  There's

14       mention of a Louise, Demetrius, Dominique and

15       Davina.  Do you know who they are?

16  A    Louise is his wife and the rest are his children.

17  Q    Demetrius, Dominique and Davina?

18  A    Right.

19  Q    Those are his children?

20  A    Right.

21  Q    How long have you known his wife?

22  A    Her parents used to live close to my parents, so

23       basically, I've known her as long as I can

24       remember.  My whole life, I guess.

25  Q    And you testified that you went by his house to

```
 1        get this letter --

 2   A    Right.

 3   Q    -- after his wife called you?

 4   A    Right.

 5   Q    If you had known that Mr. Smith was there, would

 6        you have gone to that house?

 7   A    No.

 8   Q    You knew he wasn't there?

 9   A    Right.

10            MR. SMITH:  No further questions, Judge.

11            MR. GREG GRAHAM:  Your Honor, I have a

12               couple more.

13            THE COURT:  Okay.

14                   RECROSS EXAMINATION

15   BY MR. GREG GRAHAM:

16   Q    During the course of the alleged incident, do you

17        remember if the knife remained out or if he put

18        it up?

19   A    I don't know.

20   Q    Do you know if you were cut by it?

21   A    I don't know how I got cut, I just know I was

22        cut.  I don't know how.

23   Q    But you don't know what happened to the knife?

24   A    No, I do not.

25   Q    Once he allegedly brought it out the first time,
```

1       you don't know what happened to it after that?

2  A   Right.

3  Q   And I asked you if Mr. Smith had ever sent you

4       any flowers or anything like that.  Did you ever

5       see flowers from Tuskegee Floral to your

6       workplace from Melvin?

7  A   Not that I can recall.

8  Q   For anything as simple as a birthday or anything

9       like that?

10  A   Not that I can recall.

11  Q   And you have -- on the letter that's in front of

12       you, you didn't see Melvin write out this letter,

13       did you?

14  A   No, I did not.

15  Q   So you don't have any actual knowledge that

16       Melvin wrote this letter to you?

17  A   No, I do not.

18       MR. GREG GRAHAM:  Thank you.

19       MR. SMITH:  Nothing further, Your Honor.

20       THE COURT:  All right.  May this witness

21         step down?

22       MR. SMITH:  Yes, sir.

23       THE COURT:  We're going to recess for

24         lunch.  I'm going to excuse the jurors

25         to 1:15, and I'll ask the jurors if

1      they would to keep in mind the Court's

2      instruction, do not discuss the case

3      among yourselves or with anyone else or

4      allow the case to be discussed in your

5      presence.  You may not consider or make

6      any decisions in this matter until the

7      case is delivered to you for your

8      decision in the jury room.  Thank you.

9      Be back at 1:15.

10           (Jury present.)

11           (Lunch recess.)

12           (Jury present.)

13      THE COURT:  Welcome back, ladies and

14      gentlemen.  We had broke a little bit

15      before 12 and we had finished with one

16      witness, and the State is ready to call

17      another witness.

18      MR. SMITH:  Thank you, Your Honor.  The

19      State at this time would call Patricia

20      Goodwin.

21           PATRICIA GOODWIN

22      was sworn and testified as follows:

23           DIRECT EXAMINATION

24  BY MR. SMITH:

25  Q    Ma'am, if you could look this way and speak as

| | | |
|---|---|---|
| 1 | | loudly as you can so the jurors can hear you, |
| 2 | | okay? |
| 3 | A | Okay. |
| 4 | Q | Would you tell us your name for the record? |
| 5 | A | My name is Patricia Goodwin. |
| 6 | Q | And how old are you? |
| 7 | A | 41. |
| 8 | Q | And how long have you lived in Hurtsboro? |
| 9 | A | 41 years. |
| 10 | Q | What do you do for a living? |
| 11 | A | I am a kindergarten teacher. |
| 12 | Q | Where do you teach? |
| 13 | A | Oliver Elementary School, Seale, Alabama. |
| 14 | Q | And how long? |
| 15 | A | I have been at Oliver for 18 years. |
| 16 | Q | Do you know the Defendant in this cause, Melvin |
| 17 | | Smith? |
| 18 | A | Yes. |
| 19 | Q | How long have you known him? |
| 20 | A | I'm not sure as to how many years, but I've known |
| 21 | | him since his growing up in Hurtsboro.  As far as |
| 22 | | years, practically all my life; I'll say that. |
| 23 | Q | You know his family? |
| 24 | A | I know them by name, but no association. |
| 25 | Q | How about his wife, do you know her? |

1   A   I know his wife.

2   Q   And this lady here, Annette Thomas, do you know

3       her?

4   A   Yes.  She's my sister.

5   Q   Is she your younger sister?

6   A   Yes.

7   Q   Back in October, specifically the 25th day of

8       October, 1996, were you working at Oliver

9       Elementary at that time?

10  A   Yes, I was.

11  Q   I'm going to take you back to the early morning

12      hours, say, around seven a.m. which would be

13      Central Time.  Had you been at work by that

14      point?

15  A   I was probably just getting there.

16  Q   Did something happen that morning involving your

17      sister that you were made aware of?

18  A   Yes.

19  Q   How were you made aware of this?

20  A   My sister called me at work.

21  Q   She called you at your school?

22  A   Right.

23  Q   And what did she tell you?

24  A   She just said help me, help me, Melvin Smith

25      raped me.  Help me, help me.

1    Q    What was her demeanor over the phone?

2    A    She was very hysterical and crying.  And I just

3         had to keep asking her what did you say, what did

4         you say, you know.

5    Q    When she said Melvin Smith, you knew who she was

6         talking about?

7    A    Right.

8    Q    What did you do after you heard this plea from

9         your sister?

10   A    My principal took the phone from me, and I just

11        like stood in a daze and started crying myself,

12        and she instructed me just to leave.  And I left

13        and I went home, and my aide, she drove me home.

14   Q    And what was your aide's name?

15   A    Gwen Miller.

16   Q    When you say you went home, did you go to your

17        sister's home?

18   A    I went to Annette's home.

19   Q    Do you know where she lived at that time?

20   A    Yes.

21   Q    Do you know the address?

22   A    15 Stovall Drive.

23   Q    That's here in Russell County?

24   A    Yes, it is.

25   Q    When you got there, were you the first person

1        there?

2    A   No.

3    Q   Who was there when you got there?

4    A   My aunt.

5    Q   And what's your aunt's name?

6    A   Lucille Gosha.

7    Q   So actually, you were the second one there?

8    A   Yes.

9    Q   Besides your aunt being at Ms. Thomas' home, was

10       anyone else there?

11   A   Not that I recall.

12   Q   You don't remember seeing Mr. Smith there?

13   A   No.  He wasn't there, no.

14   Q   What did you do when you got there?

15   A   We just tried to console her.

16   Q   What was her demeanor like when you got there?

17   A   She was just real tight and just crying, in one

18       of those just crying.  And I think she was

19       sitting on the bed, was just crying.

20   Q   Now, how long, if you can estimate, would it have

21       been from when you got that phone call to when

22       you got to her house?

23   A   I say about no more than 20 minutes.

24   Q   So you got there and you -- I assume you talked

25       to her and you said you tried to console her; is

1          that correct?

2    A     Right.

3    Q     What did you do then?

4    A     We just -- I can't, you know per se, say exactly

5          what I did, but we just --

6    Q     I guess my question is, did you and your sister

7          go anywhere for her to get any kind of treatment

8          or aid?

9    A     Yes, yes, yes.

10   Q     What did you all do?

11   A     The ambulance came and we carried her to the

12         hospital.  I'm trying to think of the name of it.

13   Q     Phenix Regional Hospital?

14   A     Phenix Regional, yeah, yeah.

15   Q     And did she -- did you go with her in the

16         ambulance?

17   A     Yes, I did.

18   Q     Did anybody else go with you all besides,

19         obviously, the medical personnel?

20   A     No one else.

21   Q     And what was her condition throughout the ride to

22         the hospital?

23   A     She was still crying, still very hysterical.

24   Q     Did you notice any injuries to your sister when

25         you first saw her when you got to her house?

1   A   Yes, I did.

2   Q   What kind of injuries did you notice?

3   A   On her left side, she had -- her face was

4       swollen, around her eye was swollen, and she had

5       a black eye and some scratches on her hand.

6   Q   Scratches on her hand?

7   A   Yes, sir.

8   Q   Was she bleeding in any way?

9   A   I don't -- I can't remember exactly.

10  Q   Did she complain to you that she was in any kind

11      of pain?

12  A   I don't remember her saying that.

13  Q   When you got to the hospital, what happened?

14  A   She -- well, I sat in the waiting room until they

15      examined her and I just waited for them to

16      examine her, the doctors treat her.

17  Q   Were you inside with her when the doctor examined

18      her or did you just wait outside?

19  A   I waited.  Well, I sat in until after a short

20      while, they told me that I could go back and sit

21      with her.

22  Q   She was later released from the hospital that

23      day?

24  A   Yes, sir.

25  Q   She didn't have to stay overnight or anything?

1   A     No.

2   Q     Okay.  Thank you, Ms. Goodwin.  I appreciate your

3         answers.

4               MR. SMITH:  The witness is with you.

5               THE COURT:  Does the defense have any

6                  questions of Ms. Goodwin?

7               MR. GREG GRAHAM:  Yes, Your Honor.

8                       CROSS EXAMINATION

9   BY MR. GREG GRAHAM:

10  Q     Ms. Goodwin?

11  A     Yes.

12  Q     I'm just going to ask you a few questions.  Are

13        you the sister that lived with Ms. Thomas?

14  A     No, I don't live with her anymore.

15  Q     But you did at one time?

16  A     Yes.

17  Q     Was this at the time these events took place?

18  A     No.

19  Q     When you lived with her, had Melvin ever come to

20        see you all at the house?

21  A     No.

22  Q     Had you ever seen in Hurtsboro through the

23        community, had you ever seen your sister and

24        Melvin together?

25  A     No, no.

1    Q    Not ever?

2    A    No.

3    Q    And did you know of any relationship or how would

4         you define their relationship from an outsider's

5         standpoint?

6    A    No relationship.

7    Q    Just acquaintances that rode back and forth to

8         work together?

9    A    Yes.

10    Q    When you arrived at the home, were your sister's

11        clothes, did she have the clothes -- what clothes

12        did she have on?

13    A    She had on her duster.

14    Q    Is that a jacket or a nightgown?

15    A    I can't recall if she had on a nightgown or not.

16        I know she had on her duster as far as --

17    Q    Is that like a robe?

18    A    Yeah.

19    Q    Is this a robe that buttoned from what you can

20        remember?

21    A    It snapped.

22    Q    Did you notice it torn?  Was it torn in any way?

23    A    I really can't recall that.

24    Q    Did you even pay attention to that?

25    A    I didn't pay attention.  It was just --

```
 1   Q      Thank you.
 2                 MR. GREG GRAHAM:  I have no more questions,
 3              Your Honor.
 4                 MR. SMITH:  Just a couple follow-up, Your
 5              Honor.
 6                 REDIRECT EXAMINATION
 7   BY MR. SMITH:
 8   Q      Ms. Goodwin, let me show you what's been marked
 9          as State's Exhibit Number 3, I believe.  Does
10          that look familiar to you?
11   A      Yes, it does.
12   Q      What is that?
13   A      A duster, a robe.
14   Q      Is this the robe she was wearing when you saw her
15          that morning?
16   A      Yes, sir.
17   Q      And it does have snap buttons on it; does it not?
18   A      Uh-huh. (positive response)
19   Q      And you say you've never known your sister to
20          have any kind of relationship with Melvin Smith?
21   A      No, sir.
22                 MR. SMITH:  No further questions, Your
23              Honor.  Thank you.
24                 THE COURT:  Anything further?
25                 MR. GREG GRAHAM:  We have no more questions,
```

1            Your Honor.

2        THE COURT:  All right.

3        MR. SMITH:  May she be excused, Your Honor?

4        THE COURT:  Yes, thank you.

5        MR. SMITH:  State would call Bill Landrum.

6                **WILLIAM H. LANDRUM**

7        was sworn and testified as follows:

8                **DIRECT EXAMINATION**

9    BY MR. SMITH:

10   Q    Would you state your name for the record, please?

11   A    My name is William H. Landrum.

12   Q    Mr. Landrum, where do you live presently?

13   A    I live in Wetumpka, Alabama.

14   Q    Are you at this time employed?

15   A    Yes, sir.  I'm employed by Russell Land Security

16        in Alexander City.

17   Q    Prior to your job with the security job, what did

18        you do?

19   A    I was employed with the State of Alabama

20        Department of Forensic Sciences in Montgomery as

21        a forensic biologist, which involved the

22        examination and analyses of biological fluids

23        such as blood, semen and saliva.

24   Q    Did you receive any kind of special training or

25        preparation for the work that you did with the

1          Department of Forensic Sciences?

2     A    Yes, sir.  I have a Bachelor's of Science Degree

3          in laboratory technology from Auburn University

4          which included courses in hematology, serology,

5          immunology, microbiology, anatomy and physiology,

6          and my major was in chemistry.  When I was

7          employed with the Department of Forensic Sciences

8          in 1972, I was trained in the area of forensic

9          serology from the Southern Association of

10         Forensic Scientists and also by the Bureau of

11         Federal Investigation.

12    Q    How long did you work for the Department of

13         Forensic Sciences?

14    A    For over 26 years.

15    Q    And you're presently retired; is that correct?

16    A    Yes, sir.

17    Q    Through your duties with the Department of

18         Forensic Sciences, are you presented with cases

19         from different jurisdictions within this state?

20    A    Yes, sir.  Approximately 25 counties.

21    Q    And at my request, have you reviewed a report

22         that you filed concerning this case, the State of

23         Alabama versus Melvin Smith?

24    A    Yes, sir, I have.

25    Q    You received some evidence or did you receive

1    some evidence from Russell County regarding this

2    case at sometime?

3  A    Yes, sir.  On or around October the 30th of 1996.

4  Q    And what exactly did you receive?

5  A    I received a sealed package which contained one

6    sealed sexual assault collection kit.  I also

7    received three white paper bags.

8  Q    Let me show you what I've marked as State's

9    Exhibit Number 2, and ask you if there are any

10    markings on that item which lead you to believe

11    that that is something that you yourself have

12    examined?

13  A    Yes, sir.  This is the sexual assault evidence

14    collection kit which I received.

15  Q    What did you do with that item?

16  A    It was or the item itself was opened and various

17    items in it was examined; primarily, four swabs

18    identified to be vaginal swabs and smears were

19    examined.  There was a gauze sample which was

20    examined.  There were fingernail scrapings which

21    were examined, debris collection, and a blood

22    tube containing blood.

23         MR. SMITH:  Okay.  Your Honor, at this time

24             the State would move to qualify Mr.

25             Landrum as an expert in forensic

1               biology.

2            THE COURT:  All right.

3  Q   Mr. Landrum, what kind of tests did you perform

4      to the vaginal swabs?

5  A   The vaginal swabs which consisted of four swabs

6      were examined for the presence of semen and also

7      for spermatozoa and both the components of semen

8      and spermatozoa were found on the swabs and

9      smear.

10  Q   Anything else in the rape kit that you examined

11      which was positive for some type of evidence?

12  A   Yes, sir.  There was a gauze, an envelope

13      containing gauze identified to be a genital

14      swabbing.  It was also examined and was positive

15      for both these components.  There was one sealed

16      white envelope for fingernail scrapings

17      containing two sheets of folded white paper which

18      held a small amount of debris.  This debris was

19      examined for the presence of blood, and the

20      sample identified to be from the right hand was

21      positive for blood.

22  Q   Now, let me show you one other item that I have

23      marked as State's Exhibit Number 4, and ask you

24      if there are any particular markings on that item

25      which would show that you handled at some point

1      that item?

2   A   Yes, sir.  This is a white paper bag which

3       contains a bra identified to be from Annette

4       Thomas which was also received by me on October

5       the 30th of 1996.

6   Q   As for both of these exhibits, how did you

7       receive these items?

8   A   These items came into the laboratory by U.S.

9       Priority Mail.

10  Q   And after you examined these items, what did you

11      do with them?

12  A   They were sent back to the Hurtsboro Police

13      Department and was received by the Chief of

14      Police on October the 16th of 1997.

15  Q   When you had these items in your possession,

16      other than running the tests and doing the other

17      analyses to these items, did you change or alter

18      these items in any way?

19  A   No, sir.

20  Q   If you would, open up State's Exhibit Number 4.

21      The one I just handed you, take that out,

22      please.

23  A   (Witness complies.)

24  Q   Are there any markings on that item which you

25      made on that item?

1   A   Yes, sir.  This item has a piece of tape which

2        has been attached which bears the Department of

3        Forensic Sciences' case number which has been

4        assigned to this case and my initials, WHL.

5        There's also markings which have been made where

6        testing has been performed on the bra where there

7        were brown stains seen, and these brown stains

8        were tested for the presence of blood and was

9        found to be positive for blood.

10   Q   It looks as if there are some holes in that

11        material; is that correct?

12   A   Yes, sir.

13   Q   Would that be from where you cut the material out

14        and tested it?

15   A   Yes, sir, that's correct.

16   Q   Other than doing that to the item, you haven't

17        changed or altered it in any kind of way; is that

18        correct?

19   A   That's correct.

20   Q   Is there any other evidence that you collected

21        regarding this case?

22   A   No, sir.  That's essentially all of the items

23        which I examined which was found to be positive

24        for any type of evidence.

25   Q   So you said the fingernail scrapings which you

1    found blood, the blood on the bra, the

2    spermatozoa from the genital swabbings; is that

3    correct?

4  A   From the vaginal swabbings, yes.

5  Q   The vaginal swabbings; is that correct?

6  A   Yes, sir.

7         MR. SMITH:  No further questions, Your

8            Honor.

9              CROSS EXAMINATION

10 BY MR. GREG GRAHAM:

11 Q   Mr. Landrum?

12 A   Yes, sir.

13 Q   My name is Greg Graham.  I have a few questions

14   for you.  You stated that when you received the

15   kit, who did you receive it from?

16 A   It was received by U.S. Priority Mail from which

17   was then the Chief Jay B. King, Junior, of the

18   Hurtsboro Police Department.

19 Q   So you just received it through the mail?

20 A   Yes, sir.

21 Q   And it was just packaged regularly like regular

22   mail?

23 A   It was in a sealed condition when it was received

24   into the laboratory which would be different from

25   most regular mail.

1   Q   And you stated that you recognized it as

2         something you had worked on before from some

3         markings on it?

4   A   Yes, sir.  There's several markings on the kit.

5   Q   What kind of markings would those be?

6   A   I have a xerox copy of the front of the kit,

7         which, of course, I can identify the whole front

8         of the sexual assault kit.

9   Q   And that's just -- you all don't -- you don't put

10        your -- do you put your initials on it?

11   A   Yes, sir.  It has my initials on the kit.

12   Q   And as far as the -- I'm not sure which exhibit

13        number it is.  It's this one right here.

14   A   State's Exhibit 4.

15   Q   Four.  Other than where you cut the material out,

16        were there any tears on the bra?

17   A   No, sir.

18   Q   There were no tears, just you said there was

19        blood stains?

20   A   Yes, sir.  Some blood smears.

21   Q   Okay.  Did you all -- excuse me.  Did you test

22        the blood stains to match anyone else's blood

23        type?

24   A   At the time that I received the evidence into the

25        laboratory, there was not a blood sample in the

1    laboratory from Melvin Smith for comparison, so

2    therefore, these samples from him was requested

3    and therefore no DNA comparison was performed.

4  Q  Was it compared to Ms. Thomas'?

5  A  No, sir.  We do not compare it back to the

6    person.

7  Q  To the victim, okay.  You just compare it to the

8    suspect?

9  A  Yes, sir.

10 Q  Okay.

11 A  Of course, it would have been compared back to

12   her in the process of the DNA analyses, if they

13   had been performed.

14 Q  So you have no actual knowledge of who the blood

15   would belong to that was on the brassiere?

16 A  That's correct, yes, sir.

17         MR. GREG GRAHAM:  Thank you.

18         MR. SMITH:  No further questions, Your

19            Honor.  May this witness be excused?

20         THE COURT:  Any objection.

21         MR. GREG GRAHAM:  We have no objection, Your

22            Honor.

23         THE COURT:  Yes, thank you.

24         THE WITNESS:  Thank you, sir.

25         MR. SMITH:  Thank you, Mr. Landrum.  State

1          at this time would call Sergeant Lon

2          Russell.

3                    (Brief pause.)

4                    LON RUSSELL

5          was sworn and testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. SMITH:

8    Q    Would you state your name, please?

9    A    Lon Russell.

10   Q    Mr. Russell, if you could speak up a little bit

11        louder so the jurors can hear you.  How are you

12        employed?

13   A    I'm a sergeant investigator at the sheriff's

14        office in Phenix City.

15   Q    How long have you been with the sheriff's office?

16   A    This June will be nine years.

17   Q    And what is your role at the sheriff's

18        department?  What do you do for the sheriff's

19        department?

20   A    I specifically investigate person crimes which

21        would be violent, like robberies, cuttings,

22        shootings, rapes, murders, child molestations;

23        things like that.

24   Q    Sergeant Russell, have you at my request reviewed

25        the file for the case of State of Alabama versus

1      Melvin Smith; is that correct?

2  A   Yes, I did.

3  Q   You weren't the original investigator assigned to

4      this case; is that correct?

5  A   That's correct.

6  Q   How did the case first come about being

7      investigated and by which department?

8  A   In October of 1996, the Hurtsboro Police

9      Department responded to a call inside of their

10     jurisdiction.  It was at 15 Stovall Drive which

11     is in Hurtsboro, Alabama.  They initiated the

12     investigation.

13 Q   Sergeant Russell, you said within their

14     jurisdiction.  Actually, isn't it true that the

15     sheriff's department's jurisdiction overlaps with

16     the Hurtsboro P.D.'s jurisdiction?

17 A   Yes, that's true.

18 Q   Is it customary for the Hurtsboro P.D. to handle

19     cases of this type?

20 A   It is not.

21 Q   Why is that?

22 A   Due to the size of their department, they're a

23     small department with a very small budget.  The

24     sheriff's department, we have a bigger budget

25     which affords us more opportunity to receive

1      advance training, and we have a little bit larger

2      department which allows us to have a little bit

3      more experience on hand.  So when you get into a

4      serious crime which may be a serious felony type

5      crime or maybe even a serious misdemeanor crime,

6      we come in and we investigate it instead of

7      having them do it.

8  Q   Now, since you work for the sheriff's department,

9      have you ever worked in the jail of the sheriff's

10     department?

11  A   No, I haven't.

12  Q   Are you familiar with their procedures there at

13     the jail?

14  A   Vaguely, yes.

15  Q   What is the policy regarding inmates making

16     telephone calls from the jail?

17  A   An inmate is allowed to make a phone call as long

18     as the phone call is a collect phone call.  They

19     can call anyone as long as it's collect and as

20     long as that person doesn't subsequently file a

21     complaint against the inmate; in other words,

22     saying that they decide they don't want you to

23     call and you're an inmate and you can't continue

24     to call that person.

25  Q   Would it be possible for an inmate to call

1       someone on the outside collect that that person

2       knew and then, in turn, the person whom they're

3       calling do a three-way phone call with someone

4       else?

5   A    Yes.

6            MR. GREG GRAHAM:  We'd object to that, Your

7              Honor, as irrelevant.

8            THE COURT:  Let me speak to the attorneys,

9              come forward.

10                 (Bench conference, off record.)

11            THE COURT:  The Court would sustain the

12              objection to the question.  The jury is

13              to disregard the question and the

14              answer.

15   Q   Mr. Russell, do you know where 15 Stovall Drive

16       is?

17   A   I know where the road is.  I don't know where the

18       specific house is at.

19   Q   Is Stovall Road in Russell County?

20   A   Yes, it is.

21   Q   And in what city in Russell County?

22   A   It's in Hurtsboro.

23   Q   Now, what involvement specifically did you have

24       in this case?

25   A   My main involvement, other than doing a

```
 1        background check on Mr. Smith, was interviewing

 2        Mr. Smith.  I took a written statement from Mr.

 3        Smith.

 4   Q    Where did you take that statement?

 5   A    At the sheriff's office.

 6   Q    And what day was it that you took that statement?

 7   A    That was on December the 11th, 1998.

 8   Q    And prior to that time, you had never met Mr.

 9        Smith, I take it?

10   A    No.

11   Q    When you took a statement from him, did you

12        apprise him of his constitutional rights or

13        Miranda rights?

14   A    Yes, I did.

15   Q    How did you do that?

16   A    I read his what we call Adult Advice of Rights,

17        which is the Miranda ruling.  I read it to him,

18        then allowed him to read it, and asked him if he

19        had any questions pertaining to it.

20   Q    And did he have any questions?

21   A    No.

22   Q    Did he indicate to you that he understood his

23        rights as you had read and explained them to him?

24   A    Yes, he did.

25   Q    And how did he indicate to you that he understood
```

1       that?

2   A   He signed it.

3   Q   He signed a what?

4   A   The Advice of Rights form that we have.

5   Q   Do you have that with you?

6   A   Yes, I do.

7   Q   May I see it, please?

8   A   (Witness complies.)

9   Q   I'm going to mark this State's Exhibit 7, and is

10       that the Advice of Rights form that you just

11       talked about?

12   A   Yes, it is.

13   Q   Does it fairly and accurately represent the same

14       document that Mr. Smith signed in your presence?

15   A   Yes, it does.

16   Q   Is it, in fact, the original copy?

17   A   Yes, it is.

18   Q   We ask that it be admitted, Your Honor.

19          THE COURT:  Be admitted and received.

20              (State's Exhibit 7 was admitted in

21              evidence.)

22   Q   After you advised Mr. Smith of his rights under

23       the Constitution, what did you do next?

24   A   I started asking -- having a conversation with

25       Mr. Smith, asking him questions as to the -- if

1     he knew why he was there, and we just continued

2     on in a regular conversation.

3  Q  At some point did you memorialize a written

4     statement that Mr. Smith gave you?

5  A  Yes.

6  Q  How did you go about doing that?

7  A  I would write the statement out in my writing, in

8     my handwriting, and then we would go back -- I

9     would go back and allow him to read it to make

10    any corrections, which would mean to add

11    something, take something out, or make any

12    changes that he felt we needed to make in it.

13  Q  Okay.  So if I understand your answer, you

14    actually wrote the statement from what he had

15    told you; is that correct?

16  A  Yes.

17  Q  And after you wrote the statement, you allowed

18    him an opportunity to read and examine it?

19  A  That's correct.

20  Q  Now, was he allowed to make any changes to the

21    statement that he wanted to?

22  A  Yes, he did.  Yes, he could.

23  Q  Well, did he sign the statement in any way?

24  A  He initialed at the beginning and end of each

25    paragraph, and then at the end of the statement,

1        he signed it and dated it and timed it.

2   Q   What's the point of having someone initial at the

3        beginning and end of the paragraph?

4   A   It's to insure the integrity of the statement, so

5        that nothing can be added when that person

6        leaves.  So he can't -- when he gets up and walks

7        out, I can't start writing stuff in when he

8        wasn't aware of it.

9   Q   And did he review this document in your presence?

10   A   Yes, he did.

11   Q   And did he sign it in your presence?

12   A   Yes, he did.

13   Q   Do you have a copy of that with you, Sergeant?

14   A   Yes, I do.

15   Q   And do you have your original actually with you?

16   A   Yes, I do.

17   Q   May I see it, please?

18   A   (Witness complies.)

19   Q   I'm going to label this State's Exhibit Number

20        1.  Does this document fairly and accurately

21        depict things that Melvin Smith told you and the

22        things that you wrote down on that day that you

23        interviewed him?

24   A   Yes, it does.

25   Q   Have you made any change or alterations to the

1     document in any way?

2  A   No, I haven't.

3          MR. SMITH:  We'd ask that it be admitted,

4              Your Honor.

5          THE COURT:  Be admitted and received as

6              State's Exhibit Number 1.

7          MR. SMITH:  Thank you, Your Honor.

8                  (State's Exhibit 1 was admitted in

9                  evidence.)

10 Q   Sergeant, if you would, at this time I'd ask that

11     you would read that statement to the ladies and

12     gentlemen of the jury.

13 A   I, Melvin Smith, give the following statement to

14     Sergeant Russell.  There have been no threats or

15     promises made to me and no pressure or coercion

16     used against me.  I'm giving this statement of my

17     own free will.

18          I know why I'm here at the sheriff's office

19     and I want to say that I did not rape the woman.

20     I was having an affair with her.  The woman's

21     name is Annette Thomas and I've known her for

22     over six years.  We used to ride to work

23     together.

24          I was basically just having sex with

25     Annette.  I had told her I was going to leave my

wife, but I decided that I was going to leave my
wife.  I would say that Annette and I had been
having an affair for more than one year but less
than four years.  When I say having an affair, I
mean, having sexual intercourse.  I had heard
rumors that I got Annette pregnant but that she
had had an abortion.

On the morning that this rape was to have
happened, Annette wanted me to come by her
house.  I had been drinking beer the night
before, but I wasn't drunk or even intoxicated
when I got to her house.  I was not using any
drugs and had not taken any medications.  I
remember that I had lost my job.

When I got to Annette's house, I knocked on
the door.  Annette answered the door.  She was
wearing a see-through gown.  There was no one
else home, just the two of us.  I came inside of
her house and closed the door.  We started
talking and then kissing on each other.  I
remember that I was the one to start kissing and
touching Annette.

Annette pulled me to the bedroom and we
started having sex.  I tried to tell her we
needed to stop, but it didn't work.  Before we

started having sex, I performed oral sex on
Annette.  She never performed oral sex on me.  I
came inside of Annette's vagina.

When we were through having sex, Annette
slapped me.  I hit her with my fist.  I believe I
hit her in the face.  I don't know how many times
I hit her.  I remember I couldn't control my
temper.  I didn't want to hit Annette, but she
made me do it.  I don't like to hit women and
other than Annette, I have not hit a woman.

I can remember Annette has brown skin with
white spots around her belly and hip area.  I
can't remember anything else about her body.
Annette has never showed me anything personal.  I
really don't know anything personal about
Annette.  I do feel responsible for what happened
to Annette.  I've been praying to God to help me
through this mess.

I would have to say that Annette has never
accused anyone else of rape.  I did send a letter
to my wife to try and help her calm down.  I
didn't want anything bad to happen to her.  I
also wrote in the letter that if she wanted to
show Annette to help her get through this, then
that would be all right.

1         I have read this statement and it is a true

2    and accurate representation of my conversation to

3    Sergeant Russell. I have made this statement

4    because it is the right thing to do, and that's

5    the end of it.

6  Q  Did Mr. Smith then sign the statement?

7  A  Yes, he did.

8  Q  And did you witness the statement?

9  A  Yes, I did.

10  Q  From looking at the statement, Sergeant Russell,

11    I can see of -- I know of one place in here where

12    part of it is marked through, actually a two-word

13    phrase is marked through. If you would, turn to

14    the second page?

15  A  (Witness complies.)

16  Q  About halfway down?

17  A  Yes.

18  Q  I believe you read that it says I remember that I

19    had lost my job. When I got to Annette's house,

20    I knocked on the door. Annette answered the

21    door. She was, and then the next two words,

22    completely naked, is marked through and above it,

23    wearing a see-through gown, is inserted; is that

24    correct?

25  A  Yes.

1    Q    What is the reason for that being marked out?

2    A    Sometimes to help insure that the person that I'm

3         speaking with or interviewing at that time is not

4         just trying to please me, not just trying to

5         be -- trying to make me happy, I'll put something

6         in there that I know is wrong just to make sure

7         that they're reading this and that they're doing

8         what I've asked, which is to take a second, time

9         out, go through and make sure we have everything

10        correct, and in this case, Mr. Smith, when he got

11        to that part, he saw it and he advised me that

12        was wrong, so we adjusted it and corrected it the

13        way that it should be.

14   Q    He saw the phrase completely naked and said

15        that's not correct?

16   A    Yes.

17   Q    And he made you change that part of the

18        statement?

19   A    Yes.

20   Q    Okay.

21             MR. SMITH:  Just a moment, Your Honor.

22                  (Brief pause.)

23   Q    Sergeant Russell, do you see the man in court

24        today that you interviewed and who gave you this

25        statement?

1    A    Yes.

2    Q    Would you point him out for the jury, please?

3    A    He's sitting right at this table right here in

4         front of me.

5    Q    Thank you.

6              MR. SMITH:  No further questions.

7                    CROSS EXAMINATION

8    BY MR. GREG GRAHAM:

9    Q    Sergeant Russell, how are you doing today?

10   A    Fine.

11   Q    I have a couple of questions.  On the Adult

12        Advice of Rights, I see you signed as the

13        witness?

14   A    Yes.

15   Q    And I notice there's a second spot for a

16        witness.  Is there any certain reason?

17   A    That would just be if there would be another

18        person, another officer, in the room at the time,

19        they could go ahead and witness it also.

20   Q    Does the sheriff's department just require you

21        all just to have one person witness it?

22   A    There is no requirement.  We could have one or

23        ten.

24   Q    And how long would you say the course of your

25        interview with Mr. Smith was?

1    A    I can tell you specifically if you --

2    Q    I'm not good with military time, so --

3    A    It started at 8:43 and ended at 10:25 p.m.,

4         Eastern Standard Time.

5    Q    So almost two hours?

6    A    Uh-huh. (positive response)

7    Q    Had Mr. Smith, do you know if he had -- did you

8         pick Mr. Smith up or was he already arrested?

9    A    He had been arrested on some other charges.

10   Q    So he was already in the Russell County jail?

11   A    Yes.

12   Q    Do you know how long he had been at the Russell

13        County jail?

14   A    My understanding is he only been there for a

15        couple of hours.  It was that day.

16   Q    Okay.

17   A    If I'm not mistaken.

18   Q    And did you visit him at the jail or they brought

19        him over to the sheriff's office?

20   A    I went down and got him at the jail.

21   Q    And brought him over to the sheriff's office?

22   A    Right.

23   Q    And you started taking this statement about 8:40

24        at night?

25   A    8:43.

1    Q    And was it just you and Mr. Smith in the room?

2    A    The majority of the time.  Lieutenant O'Steen,

3         periodically he would come in.

4    Q    Was he just walking in and out or --

5    A    It wasn't that quick.  He would come in for

6         some -- for a few minutes and then he would go

7         back out, and then Mr. Smith and I would talk, I

8         would write, then Lieutenant O'Steen would come

9         back in.  I can't put time limits on how long he

10        was in the room and how long he was out of the

11        room.

12   Q    Did lieutenant -- is it Lieutenant O'Steen?

13   A    Uh-huh. (positive response)

14   Q    Did he ask Mr. Smith any questions?

15   A    Yeah.  He did ask some questions.

16   Q    So he would come in every once in a while, sit

17        and listen to you question Mr. Smith, and he

18        would ask additional questions?

19   A    Yes.  And there would be times I would go out,

20        this is what I've got, and then we would discuss

21        what needed to be done next, what needed to be

22        asked and I might go back in or he might come in.

23   Q    Did Mr. Smith ever state to you that he didn't

24        wish to give a statement?

25   A    At the very end.  He said that he didn't want to

1        talk anymore at, I guess, the end of the evening.

2   Q    But before he signed the waiver, did he ever

3        state I don't want to give a statement?

4   A    No.

5   Q    And do you notice that sometimes you all change a

6        statement just to make sure someone's paying

7        attention when they're reading back through?

8   A    I do, yes, sir.

9   Q    Have you ever had it when someone read through it

10       and didn't notice the change?

11  A    Yes, they have.  I have had that, but I can go

12       back in there and ask them what about this area

13       is what I usually do.

14  Q    So if someone did miss it, you would say read

15       this section again carefully?

16  A    I'll go back and retalk over and then say is this

17       right based on our conversation to see.

18  Q    Say, even if they still don't catch it, do you

19       leave it with the change in it or do you change

20       it back from what you changed it from?

21  A    I will not leave it if I know it's inaccurate

22       based on the conversation I had with them.  We're

23       going to talk about it and either they're going

24       to say that's accurate or they're going to say

25       that's not accurate.  If I know that it is wrong,

1        I'm not going to let them sign something.

2  Q    As far as you know, is it a practice of the

3        Russell County Sheriff's Department to put a

4        change in there to see if a suspect catches it,

5        or is that just a personal procedure?

6  A    That's a personal decision to do something like

7        that.

8  Q    Okay.

9           MR. GREG GRAHAM:  Thank you.

10          MR. SMITH:  Just a couple other questions,

11          Your Honor.

12            REDIRECT EXAMINATION

13  BY MR. SMITH:

14  Q    Sergeant Russell, during the time you were

15        Mirandizing Mr. Smith and taking the statement

16        from him and interviewing him, was he given

17        bathroom breaks?

18  A    He was asked if he needed or wanted anything to

19        eat, drink, or did he need to take a break.

20  Q    Did you make him as comfortable as he could be

21        during the taking of this statement?

22  A    Yes.

23  Q    And does the statement, State's Exhibit Number 1,

24        fairly and accurately represent what he told you

25        on the evening of December 11th?

1   A    Yes.

2            MR. SMITH:  I don't have any further

3               questions, Judge.

4            MR. GREG GRAHAM:  I have a couple more, Your

5               Honor.

6               RECROSS EXAMINATION

7  BY MR. GREG GRAHAM:

8   Q    The date of the statement was December the 11th,

9        1998, correct?

10  A    Yes.

11  Q    And are you aware of what date the alleged

12        incident took place?

13  A    According to the original report, it was

14        10/25/96.

15  Q    So would you know of any reason why it was two

16        years after the alleged incident before his

17        statement was taken?

18  A    I can't explain why Hurtsboro Police Department

19        did not notify us.  They responded to this call

20        and did not go through the usual channels of

21        notifying the sheriff's office of a serious

22        crime, a violent crime, and because of that, it

23        was not brought to our attention until Mr. Smith

24        called down to the sheriff's office and asked me

25        to look into it.

1  Q    Is this a common practice for Hurtsboro Police
2       Department?

3  A    No, it is not.

4  Q    No, it's not.  If something like this happens,
5       they get in touch with you all immediately?

6  A    Usually -- we're usually responding to the
7       original scene while they're responding to it.
8       It usually is that quick.

9  Q    Were you on duty the night that you took the
10     statement or had you been called in to take the
11     statement?

12  A    No, I was on duty.

13  Q    You were just working a regular shift?

14  A    I work basically eight to five, nine to five, but
15     that day, I just -- there's no set hours for me.
16     I'm on call -- there's three investigators.  I'm
17     on call 24 hours a day, so there's no set hours.
18     If something comes up at 4:30, I work until it's
19     over with and then I can go home.

20  Q    So you can very well just be called in at 4:00 in
21     the morning then?

22  A    Uh-huh. (positive response)

23  Q    Okay.  Were you aware that Mr. Smith had been in
24     the Russell County jail since 9:00 that morning?

25  A    No, I was not.

1    Q     Okay.

2              MR. GREG GRAHAM:  Thank you.

3              MR. SMITH:  Your Honor, may I redirect just

4                   for a moment?

5              THE COURT:  Okay.  Is it a different

6                   matter?

7              MR. SMITH:  Yes, sir.

8              THE COURT:  Go ahead.

9                   FURTHER REDIRECT EXAMINATION

10   BY MR. SMITH:

11   Q     Sergeant Russell, at the time that the alleged

12         offense occurred, who would have been the chief

13         of the Hurtsboro Police Department?

14   A     That would have been Jay King.

15   Q     Is he still the chief of the Hurtsboro Police

16         Department?

17   A     No, he is not.

18              MR. SMITH:  Thank you very much.

19              MR. GREG GRAHAM:  We have no further

20                   questions, Your Honor.

21              THE COURT:  May this witness be excused?

22              MR. SMITH:  Yes, sir.  Thank you.  May we

23                   approach, Your Honor?

24                   (Bench conference, off record.)

25              THE COURT:  Ladies and gentlemen of the

1    jury, the next witness who is scheduled

2    to appear in this case is a medical

3    doctor.  He has reported that he has a

4    medical emergency and could not be here

5    at this very moment and he will be here

6    just as soon as he finishes, so we're

7    going to have to take a recess until we

8    can get the witness to obtain his

9    testimony in court.  It may be as much

10   as an hour, so I will send you back to

11   the jury room and we'll be in recess,

12   and just as soon as we can get the

13   witness here, we'll start back with

14   this case.  And I'll again instruct

15   you, please do not discuss the case

16   amongst yourselves or with anyone else

17   or allow it to be discussed in your

18   presence until it's finally delivered

19   to you for your deliberation.  Thank

20   you and thank you for your patience.

21   MR. SMITH:  Thank you, Judge.

22        (Recess.)

23        (Jury not present.)

24   THE COURT:  Is the witness here, Mr. Smith?

25   MR. SMITH:  No, sir, he's not.  I expect him

1          any moment.

2      THE COURT:  Well, we're not going to be able

3          to wait all day.

4      MR. SMITH:  Judge, I propose to -- if it

5          would be okay with the Court, I could

6          stop my presentation of evidence at

7          this point and let Mr. Smith present

8          his case, and then if the Court would

9          let me reopen my case, the doctor

10         should be here by then.

11     THE COURT:  I'm going to wait 15 more

12         minutes.

13     MR. SMITH:  Okay.

14     THE COURT:  If he's not here then, we'll

15         proceed without him.

16     MR. SMITH:  Let me put one other thing on

17         the record, Your Honor.  Before we

18         started the trial, the State had moved

19         in limine to keep the Defendant from

20         exploring the past sexual history of

21         the victim pursuant to Rule 412, and I

22         believe the defense counsel, Mr.

23         Graham, had agreed that the defense

24         would not do that.

25     MR. GREG GRAHAM:  Yes, sir.

1          THE COURT:  Well, she's already testified

2              and that wasn't done.

3          MR. SMITH:  I understand.  I just wanted it

4              on the record.  It wasn't put on the

5              record beforehand.

6                  (Recess.)

7                  (Jury present.)

8          THE COURT:  Ladies and gentlemen of the

9              jury, thank you for your patience.  I'm

10             sorry that we've had to keep you

11             waiting for so long.  I explained to

12             you the reason for the delay.  We're

13             now ready to proceed back with this

14             trial.  We have been conducting some

15             other business while you've waited, so

16             it's not been lost time completely.

17                  All right, Mr. Smith?

18         MR. SMITH:  Thank you, Your Honor.  State at

19             this time would call Dr. Steven

20             Medeiros.

21             DR. STEVEN P. MEDEIROS

22     was sworn and testified as follows:

23             DIRECT EXAMINATION

24 BY MR. SMITH:

25 Q    Would you please state your name for the record,

1       please?

2   A   Dr. Steven Paul Medeiros.

3   Q   Would you spell your last name?

4   A   M-e-d-e-i-r-o-s.

5   Q   Dr. Medeiros, where do you live currently?

6   A   I live in Lanett, Alabama.

7   Q   And are you employed presently?

8   A   Yes, sir.

9   Q   Where do you work?

10   A   The emergency department at Phenix City, Phenix
      Regional.

12   Q   What days of the week do you work at the
      emergency room here in Phenix City?

14   A   It varies.  They make the schedule out per month,
      so it just varies.

16   Q   Where is your practice at this time?

17   A   I also have a practice in Roanoke, Alabama.

18   Q   Dr. Medeiros, what kind of physician are you?

19   A   I'm a general surgeon.  I do family practice and
      emergency medicine.

21   Q   For you to be a family practitioner and surgeon,
      have you had to have some kind of specialized
      training for that?

24   A   Correct.

25   Q   What kind of training have you had?

1   A   Basically, you go to medical school and you

2       graduate.  Then I have a year of postgraduate

3       internship and four years of general surgery.

4   Q   Where did you go to undergraduate and graduate

5       school?

6   A   Oklahoma State.

7   Q   Now, back in October of 1996, would you have been

8       working at the Phenix Regional Hospital as an

9       emergency room doctor?

10   A   Yes, sir.

11   Q   Specifically, on the 25th day of October, 1996,

12       were you working?

13   A   Yes, sir.

14   Q   And at my request, have you reviewed some

15       documents submitted to you about the case we're

16       here for today?

17   A   Yes, sir.

18   Q   Doctor, I'm going to ask you if, on the day of

19       October 25th, 1996, did you examine a young lady,

20       Ms. Annette Thomas, who's here in court today?

21   A   Yes, sir, I did.

22   Q   And what was your reason for examining Ms.

23       Thomas?

24   A   She was raped or came in -- she was beaten up and

25       raped.

1   Q   When you first saw her, what did you do, if you

2       remember?

3   A   Basically, I got a history.  I walked in the room

4       and she was in the fetal position and just really

5       traumatized, and so I walked in to get a history

6       from her to find out what happened.

7   Q   Did you conduct any kind of examination?

8   A   Yes, sir.

9   Q   What kind of examination did you conduct?

10  A   Basically in a nutshell, it's from head to toe,

11      everything, with all her clothes off and

12      everything that you can examine.

13  Q   What was her demeanor as you were examining her?

14  A   She just -- she couldn't talk hardly.  She was

15      very traumatized.  I walked in and she was in a

16      fetal position.  Fetal position is when they're

17      all kind of like -- it's something that people do

18      when they've just had something really bad happen

19      to them, and you almost -- basically, it's your

20      regression type of thing because they don't know

21      how to react hardly.  But she could give me a

22      history and she was able to -- it took awhile,

23      but we got out of her what happened and

24      basically -- it was obvious that something really

25      bad had happened to her.

1    Q    Okay.  Did you note any injuries to Ms. Thomas?

2    A    Yes, sir.

3    Q    What kind of injuries did you note?

4    A    A bruising contusion on the left side of the head

5         around the eye, near the eye, and then she had a

6         fingernail broken, and then I believe her right

7         posterior hand had a bruise on it.

8    Q    And are you familiar with the term rape kit?

9    A    Yes, sir.

10   Q    What is a rape kit?

11   A    A rape kit is basically everything that you have

12        to do for a rape.  It's got all kinds of

13        little -- it's kind of a cookbook.  It goes

14        through and tells you like from head to toe;

15        you've got to get hair from the head, pubic

16        hairs, and it has everything spelled out for

17        you.  Anybody who's even not ever done a rape

18        could do it with a rape kit because it tells you

19        exactly what to do.

20   Q    Are you to collect genital swabbings --

21   A    Correct.

22   Q    -- or vaginal swabbings?

23   A    Correct.

24   Q    Is that correct?

25   A    Yes, sir.

1   Q   Let me show you what's been marked as State's

2       Exhibit Number 2 and ask you, if you could, to

3       identify that?

4   A   Well, this is the box it comes in and this is a

5       rape kit.

6   Q   Are there any particular markings on that box

7       which would indicate to you who the examinee was

8       and who the attending physician was?

9   A   Right.  Well, I signed it.

10   Q   You signed it yourself?

11   A   Yes, sir, right here.

12   Q   And that's the exact rape kit that you collected

13       on that day?

14   A   Correct, because this -- basically, after you do

15       everything, then you sign it.  You sign off on

16       it.

17   Q   Once you do the rape kit, what happens to it?

18   A   They -- it's real strict.  You have to -- you

19       can't let it go anywhere.  The nurse has to keep

20       it and then the police, you have to hand it over

21       to the police.  You can't -- it just has to stay

22       in the nurse's possession until the police come

23       and then you have to give it to them.

24   Q   Okay.  Doctor, in your medical opinion, from your

25       examination of Ms. Thomas, could you tell that

1        she had had sexual intercourse that morning?

2   A    It looked to me like she had, yes, sir.

3   Q    And based upon your overall expertise in your

4        field and what you examined on Ms. Thomas that

5        morning, her demeanor and her injuries, was Ms.

6        Thomas' injuries consistent with forcible

7        intercourse?

8   A    Yes, sir.

9   Q    And just so I might digress for a moment, Doctor,

10       you're in scrubs right now; is that correct?

11   A    Yes, sir.

12   Q    Why is that?

13   A    Well, I apologize.  I didn't have time to go

14       change.

15   Q    Okay.  You had something to attend to in the

16       emergency room today?

17   A    Actually, yeah.  I'm the one that should

18       apologize.  It's very hard to get away, you know,

19       very difficult, and today even was a slow day.

20       But usually, you start off and you may have 20

21       things come up, emergencies and things, that you

22       don't plan on.  I had a man today with an acute

23       belly pain.  But a lot of things come up in your

24       day that you don't plan on, and so it took a

25       lot -- it takes a lot of effort to get here, but

1    I felt it needed to be done.

2         MR. SMITH:  We appreciate you being here,

3         Doctor.  This is Mr. Graham.  He may

4         have some questions for you

5              CROSS EXAMINATION

6    BY MR. GREG GRAHAM:

7    Q    Good afternoon.

8    A    Hi.

9    Q    I've just got a couple of questions for you.

10        When you all perform a rape kit, and I'm asking

11        this because I simply don't know, do you have the

12        option of photographing bruises or contusions on

13        a possible victim?

14   A    We usually leave it up to the police to do that.

15   Q    And were the police present during the -- were

16        the police at the hospital when they brought her

17        in?

18   A    Do what now?

19   Q    Was anyone from the police department present

20        when Ms. Thomas was brought in?

21   A    Not to my recollection.  I think they came

22        later.  A lot of times they come later when we

23        call them.

24   Q    You said that it appeared she had had sexual

25        intercourse, but it appeared to be forcible

1      sexual intercourse?

2  A   Well, there's some swelling and what they call

3      edema. As far as the forcible, it was obvious

4      from her demeanor that, you know, she had been

5      beat up or something. Plus, too, she had a bad

6      enough bruising where I did an x-ray of it, and I

7      don't always do x-rays. I mean, you could walk

8      in the room and really know that she had been

9      beat up and, you know.

10  Q   Were there any -- did she have any tears around

11     the vaginal area or in the vaginal wall?

12  A   No, sir. But you don't always -- I mean, you

13     don't have to have tears. If you see them,

14     obviously, you know they're forcible. But if you

15     don't see tears does not mean they did not have

16     intercourse.

17  Q   But did you see any in Ms. Thomas?

18  A   No, sir.

19  Q   From her being in the fetal position, how could

20     you -- let me strike that. From the physical

21     evidence and doing the rape kit, in what way

22     could you tell that she had been raped without

23     someone telling you that?

24  A   Well, I knew she had had intercourse and she had

25     these bruises on her. You know, I've been doing

1    this 15 years and if a woman's just beat up, they

2    don't act like that.  I've done enough of these

3    and I've done quite a few that there was more

4    than just slapping her or hitting her or

5    something.  This woman was traumatized.

6  Q   This is just your opinion from years of

7    experience?

8  A   Yes, sir.

9  Q   Thank you.

10         MR. GREG GRAHAM:  I have no further

11            questions.

12         MR. SMITH:  No further questions, Your

13            Honor.

14      THE COURT:  May Dr. Medeiros be excused?

15      MR. SMITH:  He may.  Thank you, Dr.

16            Medeiros.

17      THE COURT:  Thank you.

18      THE WITNESS:  Again, I apologize to you,

19            Judge.

20      THE COURT:  That's okay.  Thank you.

21      MR. SMITH:  Your Honor, upon agreement with

22            Mr. Graham, the State would at this

23            time move to introduce State's Exhibits

24            3 and 4.

25      THE COURT:  That's the outer clothing and

103

1          the victim's brassiere; is that

2          correct?

3     MR. SMITH:  Yes, sir.

4     THE COURT:  Be admitted and received,

5          Exhibits Number 3 and Number 4.

6               (State's Exhibits 3 and 4 were

7               admitted in evidence.)

8     MR. SMITH:  Your Honor, at this time the

9          State would have concluded the

10         presentation of evidence and would

11         rest.

12    THE COURT:  All right.  Does the defense

13         have a motion at this time?

14    MR. GREG GRAHAM:  Yes, sir, Your Honor.

15    THE COURT:  If you'll come forward.  If the

16         attorneys would come forward, please.

17              (The following side-bar conference

18              was held outside the hearing of

19              the jury:)

20    THE COURT:  What's your motion at this

21         time?

22    MR. GREG GRAHAM:  We just make a motion for

23         a directed verdict at this time.

24    THE COURT:  All right.  Anything else?

25    MR. GREG GRAHAM:  No, sir.